LONE STAR LIFE INS. CO. v. SHIELD.
(No. 174–3198.)

(Commission of Appeals of Texas, Section A. Feb. 23, 1921.)

1. **Corporations** ⊜⇒92 — **Stock subscription properly paid with note.**

Under Const. art. 12, § 6, providing that no corporation shall issue stock or bonds except for money paid, labor done, or property actually received, a corporation might recover on a subscriber's note secured by first lien on land double in value the amount of the note.

2. **Corporations** ⊜⇒92—**No showing that note was given for unpaid capital stock.**

Evidence *held* not to show that a note was given in payment for unpaid corporate capital stock.

3. **Corporations** ⊜⇒80(5)—**Statements by agent selling stock held mere expressions of opinion not fraudulent.**

Representations by agent selling corporate stock that the company was one of the best in Texas, that the dividends which it would declare would pay off the note by the time it matured, that the company would put expert salesmen in the territory adjacent to defendant's bank to sell insurance and allow him 50 per cent. of the first year premiums, and that the company could keep on deposit as much as $2,000 in the bank, *held* to be expressions of opinion or promises to do something in the future which would not be a good defense to the note; the company being solvent.

4. **Corporations** ⊜⇒80(10) — **Right to defend against note for stock on ground of fraud held waived.**

A subscriber who gave a note for corporate stock waived any defense as to false representations and promises, where, after the corporation failed to comply with its promises, he continued to pay interest on the note and acted as director.

Error to Court of Civil Appeals of Fifth Supreme Judicial District.

Action by the Lone Star Life Insurance Company against L. L. Shield. From a judgment of the Court of Civil Appeals (202 S. W. 211) which reversed a judgment for plaintiff and rendered one for defendant, plaintiff brings error. Judgment of the Court of Civil Appeals reversed, and that of trial court affirmed.

Coke & Coke, of Dallas, for plaintiff in error.

Snodgrass, Dibrell & Snodgrass, of Coleman, for defendant in error.

TAYLOR, J. The Lone Star Life Insurance Company, plaintiff in error, sued L. L. Shield, defendant in error, upon a promissory note for $2,000. There was pledged with the company to secure the payment of the note a certain collateral vendor's lien note, but no redress of any character was asked against the collateral. The court peremptorily instructed a verdict in favor of the company for the amount of the note, interest, and attorney's fees. The Court of Civil Appeals reversed the judgment of the trial court and rendered judgment in favor of defendant in error. 202 S. W. 211.

Defendant in error pleaded the following defenses against the note:

First. That it was void because given by Shield to the company in consideration of the issuance and delivery to him of 10 shares of its capital stock subscribed for by him.

Second. That the company sold all of its assets without the consent of defendant in error, and abandoned the corporate enterprise.

Third. That the execution of the note was procured by reason of false and fraudulent representations on the part of the company and its agents.

Fourth. That defendant in error executed the note on certain conditions that were not complied with.

Plaintiff in error by supplemental petition pleaded a general denial, estoppel, the four years' statute of limitation, and that Shield had by his conduct waived his right to urge the defense of fraudulent misrepresentations.

The evidence presents no material conflicts, and consists principally of the stock subscription contract, the correspondence of the parties, stock certificates and stubs, copies of the minutes of the stockholders' and directors' meetings, and the testimony of Henry Hamilton, secretary of the company, and defendant in error.

The subscription contract was entered into February 3, 1910, between L. H. Morgan & Co. and defendant in error. The latter, in consideration of the promise of Morgan & Co. to endeavor to accomplish the organization of the company on or before December 3,

---

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

1910, and to defray the expenses thereof, subscribed to 100 one-tenth shares of the capital stock of plaintiff in error company, agreeing to pay therefor the sum of $2,000, $1,500 to the company, and the sum of $500 to Morgan & Co. The payment of the $500 was to be concurrent with the making of the contract, and the $1,500 was to be paid at any time after February 15, 1910, immediately upon receipt of notice from Morgan & Co. that the capital stock of the insurance company had been subscribed and a designated part thereof had been paid in. The $1,500 was to be paid in money or in securities satisfactory to the insurance department of Texas. The subscription contract further provided that no representations or agreements other than those printed therein should be binding upon Morgan & Co. or the insurance company. A $500 note was executed and delivered to Morgan & Co. by Shield pursuant to the terms of the agreement, and was transferred before maturity to the Commonwealth National Bank of Dallas. Upon the execution of the subscription contract, Coke W. Harkrider, one of the parties acting for Morgan & Co., wrote Shield a letter of confirmation, in which he stated that Shield's bank would be made depository for all sales of insurance made in his section.

The correspondence in evidence reveals that beginning April 14, 1910, negotiations were in progress for some time between Shield and the insurance company looking to an adjustment of a controversy that had arisen respecting the payment of the balance of $1,500 due by the terms of the stock subscription. The company on June 14th wrote Shields expressing its willingness to accept vendor's lien notes, the title of the land being good, in lieu of cash for the $1,500 balance, provided the notes did not represent more than 50 per cent. of the value of the land securing their payment. In the same letter Shield was advised that, while he had been elected a director of the company, he had not qualified to serve as such by paying his subscription for stock. On August 9th the company forwarded a blank note to Shield offering to issue the stock and attach to it his note. Shield replied August 13th refusing to execute the note, claiming it was not in accordance with the terms of the original contract. On September 24th Shield made a compromise offer of settlement, and on the 28th the company made a counter proposition, which was accepted. On October 3d the company forwarded to Shield his blank note for $2,000 dated October 1, 1910, due in five years, interest payable at 5 per cent. per annum, and directed him to execute the note and return it, together with the land notes which he had agreed to give to secure its payment. The company agreed that upon receipt of the notes, appraisement of the land, etc., it would issue the stock, send it to Shield, and take up his $500 note to Morgan & Co.,

which he had transferred to the Commonwealth National Bank.

On October 5th Shield wrote the company inclosing his note and certain notes collateral thereto; also an appraisal of the land. On October 7th the company replied acknowledging receipt of the notes, and requested that abstract of title to the land upon which lien was reserved be forwarded to the company. In closing the letter the company advised Shield that—

"Our stock is now fully paid up, and we expect to be writing insurance in a very short time."

After the notes had been received the company wrote Shield suggesting closing the deal in such manner as to give him time in which to arrange his collateral, the abstract not having been received. Shield thereupon went to Dallas, and on November 30th executed and delivered to the company the note sued on. He gave also a collateral note for $2,480, the payment of which was secured by a vendor's lien on land. While the transaction which was consummated by the giving of the note sued on constituted legally a new contract, it was in material respects identical with that proposed in the company's letter of September 28th, the material part of which is as follows:

"The company will however be willing to take your personal note for $2,000.00 to run for five years at five per cent. interest per annum, payable annually, same to be secured by vendor lien notes in accordance with the requirements of the Insurance Department, and issue you ten full shares of the capital stock of the company and pay off the $500.00 note, provided there is no past due interest or protest fees or attorneys' fees due on same.

"Again, we have a little spare money at this time and if you will close up along these lines, we will deposit $2,000.00 with your bank. This deposit to be subject to check at any time and not to draw any interest:

"Of course, when we get to doing business in your country, you can be of great assistance to us with your influence and acquaintance and we are not overlooking the fact that this is true. You ought to be willing to leave it to the good judgment of the management of the company to see that your bank gets the benefit of the business done in that part of the state, and we believe that you will, knowing the men as you do who are chiefly interested in the company.

"The writer believes you will never regret taking up our offer to assist you in closing up your subscription in the manner outlined above and is of the opinion that as a director and stockholder in the company, our relations could and would be made mutually pleasant and profitable."

The company upon the execution and delivery of the $2,000 note issued to Shield certificate No. 117 for 10 shares of stock. The Court of Civil Appeals states, and it so appears from the evidence, that certificate

No. 113 for 10 shares of stock was canceled and the same number of shares of stock in lieu thereof issued to Shield as certificate No. 117; that the original stub book of certificates had on it:

"The number of the original certificate 113, number of original shares 10, number of shares transferred 10. Received certificate No. 117 for 10 shares of stock, this, the 30th day of November 1910. [Signed] L. L. Shield."

The stub of certificate No. 117 also had on it: "From whom transferred, E. H. Reardon, trustee."

The action of the Court of Civil Appeals in reversing the judgment of the trial court and rendering judgment in favor of Shield was predicated upon the view (a) that the note was void, because executed in payment for shares of the company's capital stock, and (b) because the company sold its entire assets and abandoned the corporate enterprise without Shields' consent. In other words, the Court of Civil Appeals was of opinion that the first and second defenses urged against the note were established.

We are unable to concur in the view that the note was void.

[1] The record as a whole discloses no violation of the constitutional provision that no corporation shall issue stock or bonds except for, among other things, property actually received. The only note the company contemplated taking in consideration for the issuance of shares of its capital stock was a note secured by a first lien on land double in value the amount of the note. Such a sale of the capital stock would have been legal. General Bonding & Casualty Insurance Co. v. Mosely, 222 S. W. 961 (not yet [officially] reported). It is not necessary, however, in the view we take of the case, to determine whether the note and land security received by the company met the requirement of the constitutional provision.

[2] It is not disputed that the company had no unpaid stock at the time of the execution of the note. Shield's stock subscription was forfeited for nonpayment on his part. As stated by the Court of Civil Appeals:

"The evidence shows that the officers of the company on checking up on September 28, 1910, found that all the stock had been paid for except 433 shares, and in order to get a permit to do business they paid in $64,955 for said stock to the company and it issued certificates of stock numbered from 105 to 115 to E. M. Reardon, trustee."

This stock was purchased by a syndicate composed of C. C. Slaughter and eight others, including Reardon, and was paid for by them. The insurance department upon a showing being made that the stock was paid up in full issued to the company on October 29, 1910, a permit to transact the business of life insurance. There is no evidence that the company sold "its" stock to Shield, and it is uncontroverted that the stock when sold and issued to him belonged to Reardon, trustee. The evidence shows no divestiture of Reardon's title prior to the sale to Shield, but does not show that Shield knew who owned it. He was advised by letter before executing the note sued on that the capital stock of the company had been paid up in full; but conceding that he did not know this, or that it was Reardon's stock that he bought, his ignorance of these facts does not tend to establish that it was the company's unpaid capital stock that he purchased. Inasmuch as it was not such stock that was issued to Shield, the constitutional question is not in the case.

The second defense, in view of the disposition of the first, is not maintainable. The abandonment of the corporate enterprise after Shield became the owner of the Reardon stock is not a ground under the circumstances stated on which he could defeat his legal obligation held by the company.

The third and fourth defenses against the note are based on alleged fraudulent representations on the part of the company, and a failure to comply with certain conditions upon which the note was alleged to have been executed. These defenses are embodied in propositions numbered 3 and 4, respectively, under the first assignment of error of appellant's (Shield's) brief filed in the Court of Civil Appeals. The alleged misrepresentations are that Dr. Johnson, president of the company, represented to Shield: (1) That the company was one of the best in Texas; (2) that it was solvent; (3) that the dividends it would declare would pay off the note by the time it matured; (4) that the company would put expert salesmen in the territory adjacent to Shield's bank to sell insurance and allow him 50 per cent. of the first year premiums; and that (5) the company would keep on deposit as much as $2,000 in Shield's bank. It was also alleged that the representations were made with no intentions of complying therewith. It was further alleged that the note was executed upon the condition that Shield was to be elected a director of the company and remain a director as long as he owned any of its capital stock.

We doubt if the alleged representations, in view of the fact that no rescission was sought, constitute a defense to the note. Bigham v. Bigham, 57 Tex. 238; C. T. & M. C. Ry. Co. v. Titterington, 84 Tex. 218, 19 S. W. 472, 31 Am. St. Rep. 39.

[3] No offer was made by Shield to return the stock or to refund the $500 paid for him by the company. The allegations and representations made which have any evidence to support them are remote and speculative in their nature, or relate to mere expressions of opinion, or constitute promises to do something in the future. There is no evidence that any of the promises were made with an intention not to comply therewith. An assertion by a stock salesman made to one with

whom he is dealing at arm's length—in this case a president of a bank—that an unorganized company in which he is selling stock is one of the best in the state, and that the stock will pay itself out in dividends, is not sufficient to create an obligation on the company's part. The evidence showed, and the Court of Civil Appeals found, that the company was solvent. That the company would put salesmen in the field to sell insurance in the vicinity of Shield's bank and divide with him the first year premiums is merely a future promise and is not a representation of fact. There is no evidence that Shield was damaged by a failure of the company to deposit subject to its check $2,000 in the bank of which he was president. He was a director of the company from the time he was qualified to act in that capacity until March 11, 1913. He was not re-elected at that time, the Commissioner of Insurance and Banking holding that he was not qualified to act as a director because of his indebtedness to the company.

[4] Regardless of whether the allegations of fraud and noncompliance constitute a defense against the note, Shield by waiver and ratification by his course of action lost whatever right he had to urge the representations made to defeat liability. Fletcher's Cyclopedia of Corporations, vol. 2, § 716; Thompson on Corporations, vol. 1, § 749. His subscription contract was valid. He was a stockholder from November 30, 1910, until the trial of the case, six years later. He attended stockholders' meetings. He exercised rights that only a stockholder could exercise. He authorized Hamilton, the secretary of the company, to represent him by proxy at a meeting held as late as March 28, 1914. His tenure of office as director is stated above. He continued to pay interest on the note sued on to November 30, 1913, a period of three years. If the company had failed to comply with its promises in any particular, he became aware of it and continued, after he knew it had so failed, to act in such manner as to show an affirmance of his purchase of the stock.

The trial court was not in error in peremptorily instructing a verdict for plaintiff in error.

The remaining assignments of error in appellant's brief relate to the admissibility of evidence and the refusal of the court to submit to the jury the special issues requested. Our holdings upon the questions discussed render these assignments immaterial.

We recommend that the judgment of the Court of Civil Appeals be reversed and that of the trial court affirmed.

PHILLIPS, C. J. The judgment recommended in this case by the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.