### WEICHSEL et al. v. JONES.
#### No. 12231.

Court of Civil Appeals of Texas. Dallas.

June 26, 1937.

Rehearing Denied Oct. 9, 1937.

Webster Atwell, of Dallas, for appellants.

Storey, Sanders, Sherrill & Armstrong, of Dallas, for appellee.

JONES, Chief Justice.

This suit was instituted in a District court of Dallas county by appellants, Christian C. Weichsel and S. J. Hay, to recover against appellee, T. R. Jones, a balance alleged to be due by virtue of an underwriting agreement executed by appellee and fifteen others, all stockholders in the Great National Life Insurance Company, in order to insure the issuance and immediate sale of a new issue of stock in the insurance company. Appellants were made trustees for the obligors in said underwriting agreement, and were given authority as such trustees to execute a note to the Republic National Bank & Trust Company, as the obligation of the subscribers to said underwriting agreement, to pay the insurance company for the subscribed stock. Appellants were required by the payee to indorse such note personally and were subsequently required by the then holder of the note to discharge the alleged obligation incurred by appellee. A judgment resulted in favor of appellee, and appellants have duly perfected their appeal to this court. The following are the necessary facts:

The Great Northern Life Insurance Company was organized, obtained a charter, and began doing business in 1928 as a life insurance company. Its salaried officers during all of the time under inquiry in this suit were appellant S. J. Hay, president, Bert J. Jones, vice president and agency manager, Carl C. Weichsel (son of appellant Weichsel), secretary.

Appellant Christian C. Weichsel was the largest stockholder in said insurance company and, during all of the time in question, was on the board of directors. Appellee was a large stockholder and a large policy carrier in the insurance company, but held no official position—either as director, trustee, or otherwise—with said insurance company.

In the latter part of 1930, it was discovered that the forthcoming annual report, to be made December 31, 1930, to the commissioner of insurance, would show that the capital stock of the insurance company had become impaired, and, realizing that such a condition would greatly handicap the insurance company in the transaction of life insurance business, if not in the near future cause its liquidation, the board of directors formulated a plan to submit to the stockholders the proposition of an increase in the capital stock of the insurance company from $200,000 to $325,000, an increase of $125,000, and for the immediate sale of the increased capital stock, or a large portion of same, and thereby prevent any showing of an impaired capital stock in said forthcoming report. A special stockholders' meeting was called, the increase in capital stock, advised by the directors, was authorized, and the plan for selling the new stock was ratified by the stockholders.

In order to insure the immediate sale of the new shares of stock, there was adopted the administrative plan, shown by the following instrument, headed "Underwriting Agreement," bearing date of December 15, 1930. As this agreement is the basis for all the controversies in this law suit, it is here quoted in full:

"In order to insure the issuance and sale of shares of stock evidencing a proposed increase of the capitalization of Great National Life Insurance Company of Dallas, we, the undersigned, as Underwriters, hereby severally subscribe for the number of shares of said stock set opposite our respective names at the purchase price of $22.50 per share.

"To further expedite the financing of said purchase and the resale of such shares, we hereby severally appoint Christian C. Weichsel and S. J. Hay as our joint agents and attorneys-in-fact, and as trustees, with the powers and duties hereinafter set out.

"We hereby authorize, empower and direct said agents to borrow from Republic National Bank & Tr. Co. the total purchase price of the aggregate number of shares herein subscribed, and to execute in our several names, or their names as trustees, a note or notes evidencing the funds so borrowed, and from time to time to execute renewals and/or extensions thereof, or for the balance remaining unpaid thereon.

"We further authorize, empower and direct said agents to purchase the shares of stock herein subscribed, causing the same to be issued to Christian C. Weichsel and S. J. Hay, trustees, and to pledge said shares of stock and the notes so executed by us as security for the payment of the aggregate balance from time to time remaining unpaid on the note or notes so executed by said trustees, and to execute all necessary and proper pledge agreements with respect thereto.

"We further authorize, empower and direct our said agents and trustees to resell all or any part of the shares of stock so issued to them, at the purchase price of $25.00 per share, and to redeliver to said Great National Life Insurance Company the shares so sold, for reissuance by it to the purchasers thereof, and after deducting from the proceeds of such sales a selling agent's commission of ten per cent thereof, to apply the balance thereof to the payment of the note or notes so executed by them, and the said Republic Nat'l Bk. & Tr. Co. hereby agrees to release the shares so sold, and to redeliver the same to said trustees upon a pro tanto payment of the indebtedness secured thereby.

"It is further agreed that the liability of said trustees in the execution of said note or notes shall be that of an agent only, except in so far as said trustees are themselves subscribers hereto, and that the liability of the subscribers hereto for the payment of the note or notes so executed by their said agents and trustees shall be several alone, and in proportion only to the number of shares subscribed for by them, respectively.

"It is further agreed that all sales hereafter made by said trustees, shall be prorated to and among the several subscribers hereto, and shall proportionately reduce the number of shares to which each of said subscribers is entitled to receive upon

the payment of the purchase price thereof, and shall likewise proportionately reduce the liability of the several subscribers hereto upon the note or notes hereinabove mentioned.

"Upon the payment of any subscriber hereto of any part of the purchase price of the shares of stock to which he is entitled hereunder, said shares of stock, to the extent of such payment, shall be delivered to him and the purchase price so paid credited upon his liability hereunder.

"If at the end of one year from the date hereof (unless the time be further extended by mutual agreement), all or any part of the shares of stock so purchased shall not have been resold, each of the subscribers hereto, who shall not previously have done so, hereby agrees at such time to pay the purchase price of $22.50 for shares of stock then remaining accredited to him, and upon such payment said shares of stock shall be reissued and redelivered to him, his note for the purchase price thereof surrendered and delivered to him, and all liability of such subscriber, under the terms of this contract, and upon any note executed by the trustees, shall cease, and this contract shall be of no further force and effect.

"In the event of a sale of any of said shares of stock under the terms of the pledge agreement made by the trustees to said Bank, any subscribers thereto, or either of the trustees herein named, may purchase the shares of stock so sold for his own account.

"Executed this the 15th day of December, A. D. 1930.

| Name | Number of Shares | Amount |
|---|---|---|
| Christian C. Weichsel | 1200 | $27,000.00 |
| Carl C. Weichsel | 200 | 4,500.00 |
| Robert F. Weichsel | 200 | 4,500.00 |
| S. F. Hay | 200 | 4,500.00 |
| Bert J. Jones | 200 | 4,500.00 |
| D. R. Murchison | 400 | 9,000.00 |
| C. F. Chambers | 400 | 9,000.00 |
| Ernest M. Tennant | 200 | 4,500.00 |
| T. R. Jones | 500 | 11,250.00 |
| H. C. Morris | 200 | 4,500.00 |
| R. M. Redding | 100 | 2,250.00 |
| Webster Atwell | 200 | 4,500.00 |
| J. F. Parks | 100 | 2,250.00 |
| David Metzger | 100 | 2,250.00 |
| O. S. Boggess | 100 | 2,250.00 |
| W. E. Easterwood, Jr. | 200 | 4,500.00" |

The following clause was executed by the insurance company and appended to the underwriting agreement at the request of the Republic National Bank & Trust Company, the lender of the money:

"In consideration of the foregoing subscriptions and the underwriting of the sale of said shares of stock, the undersigned, Great National Life Insurance Company, hereby agrees to sell said shares of stock at the price of $22.50 per share, allowing and deducting from their market price of $22.50 the ten per cent allowable for marketing said stock.

"Great National Life Insurance
Company
"By S. F. Hay, President.
"Attest: Carl C. Weichsel, Secretary."

During the latter part of the year 1931, the capital stock of the life insurance company was legally reduced from $325,000 to $200,000, and by reason of such reduction the number of outstanding shares of stock were reduced from 32,500 to 20,000 shares. The outstanding shares were called in and new shares issued, each stockholder receiving, in lieu of his old shares, new shares, amounting to eight-thirteenths of the shares he then held.

On December 1, 1931, the underwriting agreement was extended by written agreement of all of the original subscribers, for one year from December 15, 1931; this extension agreement taking note of, and providing for, the reduction in shares on account of the reduction of the capital stock. On December 1, 1932, a second extension agreement was entered into, which was signed by all of the subscribers to the original underwriting agreement. This second extension agreement recites that: "The undersigned, who are subscribers to shares of stock in Great National Life Insurance Company, under the terms and provisions of an underwriting agreement, dated December 15, 1930, as extended and modified by a supplementary agreement dated December 1, 1931, by the terms of which said agreement we have severally obligated ourselves to liquidate our obligations thereunder on or before December 15, 1932, do hereby agree that said underwriting agreement shall continue in full force and effect after December 15, 1932, and we do hereby severally agree that Christian C. Weichsel and S. J. Hay shall continue to act as our agents and trustees under the provisions of said original agreement, as extended and modified, with all the powers and duties therein set out so long as any part

of the shares of stock therein subscribed shall remain unsold or until within the judgment of said trustees, it is to the best interest of the subscribers to said underwriting agreement that the same be terminated, and that the obligations of the several subscribers thereto be liquidated." The purpose of these extensions was for the trustees to continue their efforts to resell the stock the subscribers had purchased, when they executed the underwriting agreement.

In the latter part of the year 1933, the then holder of the trustee's note, the First National Bank in Dallas, demanded that the indebtedness be reduced and appellants notified each subscriber that such indebtedness, which then amounted to $85,737.60, would have to be reduced by payment of 25 per cent. of such indebtedness, and S. J. Hay, acting for himself and Christian C. Weichsel, notified appellee on November 4, 1933, that such reduction in the indebtedness would have to be made, and that 25 per cent. of his then existing indebtedness was $2,381.60, and demand was made upon appellee to pay such sum of money. Appellee refused to respond to this demand.

In the year 1934, the trustees, exercising the powers given them in the underwriting agreement and especially in the second written extension, decided that it was to the best interest of the subscribers that the underwriting agreement be terminated and the obligations of the several subscribers liquidated, and on June 15, 1934, S. J. Hay and Christian C. Weichsel notified appellee that such liquidation had been determined upon and requested that arrangement be made by him to pay the balance due before June 22, 1934; the balance then due on appellee's obligation was the sum of $9,526.40. A similar notice, naming the amount due by each, was sent to the other subscribers to the underwriting agreement. Appellee not only failed to respond to the request but repudiated such indebtedness.

On March 7, 1935, the said trustees wrote a letter to appellee, reminding him of the former request relative to liquidating the amount due by him on the underwriting agreement, and in such letter stated: "All of the persons who signed said instrument have taken care of their obligations except you and Bert J. Jones. The note which was executed by your agents in accordance with the underwriting agreement, is due March 8, 1935. This note is now being carried by the First National Bank in Dallas. We have had to endorse this paper. Unless you take care of this obligation today, we will be called upon to take care of the same by virtue of our endorsement and, accordingly, we will have to take such appropriate action against you as is necessary to recover our loss." Signed by said trustees.

The original note and each renewal note executed by appellants as trustees matured ninety days after date, and was renewed each time thereafter for the amount then due on the indebtedness. The interest on the note was ostensibly paid by the three salaried officers of the insurance company, to wit, S. J. Hay, Bert J. Jones, and Carl C. Weichsel; in fact, however, by resolution of the board of directors, the salary of each of these said officers was increased to an amount equal to the interest that was to be paid. These officers drew their salaries semimonthly, and this increase in salary was at once deposited in the bank to the credit of Hay and Weichsel, trustees, for the payment of the interest, and not used by the officers. However, the rate of interest on the note was decreased from 6 per cent. to 5 per cent. and, by reason of this decrease in the interest rate, when the indebtedness was liquidated there remained a balance of this increase in salary, not used for the payment of interest of approximately $2,000, which sum, by resolution of the board of directors, was apportioned to the three said officers, according to their respective salaries, and this sum was paid by the trustees to the respective officers, and was used by them as their individual money. In this indirect way, therefore, the interest on the note was paid by the Great National Life Insurance Company. However, the question as to whether this was a legal expenditure by the insurance company is not before this court on this appeal.

Appellants, as personal indorsers of said note, were bound for its payment, and in the early part of the year 1935 the note was purchased by these trustees at its face value from the then owner, the First National Bank in Dallas, and assigned to said trustees. By reason of this purchase and assignment of the note, the subscribers of stock in the underwriting agreement became severally responsible to appellants, each to the extent of the amount he owned on his stock subscription, and appel-

lants had the right to subject the pledged shares of stock of each subscriber to payment of such indebtedness. It appears from the record that all of the other subscribers who had not theretofore paid the amount due on their subscriptions made a satisfactory arrangement with appellants for such payment, except appellee and Bert J. Jones. After due notice on March 21, 1935, of their intention to do so, the pledged shares of stock owned by appellee, being then 260 in number, were sold on March 30, 1935, for the sum of $20 per share and bought in by Christian C. Weichsel, appellee being given credit for the proceeds of this sale. After this credit was given, appellee's indebtedness amounted to $5,256.16. This suit was instituted to recover the said balance of the indebtedness incurred by appellee, when he subscribed for 500 shares of stock, as shown by the underwriting agreement.

Appellants in their petition alleged substantially the facts herein stated, attaching the various instruments mentioned to their petition as exhibits. They based their rights of recovery on two theories: (1) That appellants purchased the note held by the First National Bank in Dallas, and which was executed by them as agents of defendant, and also indorsed by them individually, for which reason they are entitled to recover from appellee the amount due by him on the note, together with attorney fees and interest at the rate of 10 per cent. per annum from March 7, 1935; and (2) that they are entitled to recover the amount sought from appellee, such sum of money together with such rate of interest, as reimbursement to them of the loss they sustained by reason of their personal indorsement on the note.

Appellee defended on the grounds, as reflected by his answer and his brief: (1) That Bert J. Jones, an officer of the Great National Life Insurance Company, represented to appellee that he was not actually expected to subscribe for or pay for any stock and that the appellee was merely lending his name as an accommodation to the insurance company and that the insurance company agreed to sell the stock, and that he would never be expected or called upon to pay anything whatsoever, and that appellee relied upon such representations in executing the underwriting agreement December 15, 1930; (b) that the scheme of purchasing stock called for under the underwriting agreement, which represented an increased capital of the insurance company, was unlawful as being in violation of the statutes of this state; (c) that the defendant received no consideration for signing the underwriting agreement; (d) that the other subscribers to the underwriting agreement had been permitted to pay their obligations in the form of notes and otherwise, which was a discrimination against the defendant.

Appellants directed special exceptions to each of the special defenses alleged in appellee's answer, and the court sustained same. To this ruling of the court appellee excepted but has filed no cross-assignments of error on such ruling. So that appellee, as between him and appellants, went to trial on an answer consisting of a general demurrer and a general denial. However, the same pleading was urged in appellee's cross-action against the Great National Life Insurance Company, and the same exceptions urged against such special pleading with a contrary ruling of the court. However, under the view we take of this case, we do not think this question of appellee's pleading is material to its disposition.

Appellants seasonably made a motion for peremptory instruction in their favor, as also did the Great National Life Insurance Company. These motions were overruled and, over appellants' timely objections, submitted the defenses of appellee, stricken from his answer by special exceptions, and the findings of the jury thereon are in favor of appellee as follows: (1) That, prior to the time of the execution of the alleged underwriting agreement by appellee, Bert J. Jones represented to appellee that the Great National Life Insurance Company would sell all of the stock represented by the underwriting agreement, and that appellee would never be called upon to pay for same; (2) that said representation was made to appellee for the purpose of inducing him to execute the alleged underwriting agreement; (3) that appellee would not have executed said alleged underwriting agreement, if Bert J. Jones had not represented to him that the Great National Life Insurance Company would sell all of the stock described therein, and that appellee would not be called upon to pay any money therefor; (4) that prior to the signing of the underwriting agreement by appellee, Bert J. Jones represented to appellee that he was

only signing same as an accommodation to the Great National Life Insurance Company; (5) that said representations were made by the said Bert J. Jones to appellee for the purpose of inducing appellee to execute the alleged underwriting agreement; (6) that appellee would not have executed the underwriting agreement if Bert J. Jones had not represented to him that said instrument was being signed merely as an accommodation of the Great National Life Insurance Company; (7) that at the time of the execution of the underwriting agreement by appellee Bert J. Jones was acting as the representative of appellants; (8) that prior to the execution of the instrument in question by appellee Bert J. Jones was authorized by appellant to make the representations inquired about; (9) that at the time of such representations made by Bert J. Jones to appellee, as inquired about in special issues numbers one and four, Bert J. Jones was acting for and on behalf of the Great National Life Insurance Company; (10) that Bert J. Jones agreed with appellee that appellee would not be required to buy stock if he signed the instrument presented to him by Bert J. Jones; (11) that appellee signed the said instrument with the understanding and upon the condition that he would not be required to buy the stock in connection therewith. These findings are made the basis of the judgment in this case. Is such judgment authorized?

As appellants' cause of action must stand or fall on the validity of the underwriting agreement, we will first give a brief analysis of such agreement. Faced with the condition of an impaired capital stock existing in the latter part of 1930. which would be shown by the required annual report of December 31, 1930, the directors of the insurance company, in order to prevent such a showing as to its capital stock, put before the stockholders the necessity of increasing the capital stock from $200,000 to $325,000. This increase in capital stock was duly voted by the stockholders at a special meeting called for such purpose. It was necessary to realize at once upon this increase of capital stock in order that the forthcoming report to the commissioner of insurance would not show any impairment of the capital stock of the insurance company. Manifestly, the time was too short to take the chance of an immediate sale of the

stock by the ordinary method of selling stock, therefore, the plan of selling the stock, as shown by the underwriting agreement, was adopted. This is made plain by the first paragraph of the underwriting agreement: "In order to secure the issuance and sale of shares of stock evidencing proposed increase of the capitalization of the Great National Life Insurance Company of Dallas, We, the undersigned, as underwriters, hereby severally subscribe for the number of shares of said stock set opposite our respective names at the purchase price of $22.50 per share." The agreement was signed by sixteen stockholders in the Great National Life Insurance Company, each naming the number of shares of stock he subscribed and value at $22.50 per share; the total amount of shares thus subscribed was 4,500, the total sales value amounting to $101,250. Each subscriber was responsible for his own subscription only; that is, it was a several and not a joint obligation.

The underwriting agreement is twofold in nature: First, it manifests a contract between the Great National Life Insurance Company and each subscriber. Each subscriber agrees to purchase a certain stated number of shares of stock in the Great National Life Insurance Company at the net price of $22.50 per share, and to pay the insurance company the full value of these shares at the designated price. The insurance company agrees to sell at such price to each subscriber the number of shares subscribed by him. Under the Constitution of this State, section 6 of article 12, no stock can be issued to a subscriber until the same is fully paid for either in money, labor, or property. To the same effect is article 1308, R.C.S. Under the undisputed evidence in this case, the Great National Life Insurance Company received in money the full sales value of all the stock subscribed for and issued under the underwriting agreement.

Second, it is an agreement among the subscribers to a plan for financing the purchase of the subscribed shares. Briefly, this plan is, that appellants are appointed trustees and agents of the subscribers and for their benefit, to execute a note to the Republic National Bank & Trust Company for the full amount of the purchase price of the shares subscribed and the money thus borrowed to be paid to the Great National Life Insurance Company, and, as

trustees, to receive from the insurance company for each subscriber the number of shares subscribed and thus paid for, and to pledge such shares and the underwriting agreement as security for such note; then to resell the shares at the same net price and when any of such shares are resold to surrender same to the Great National Life Insurance Company and have the same number of shares reissued by said company to the purchaser in the resale transaction,.the proceeds of the resale of shares to be credited on the note and the obligation of such subscriber lessened proportionately to the shares he had originally purchased.

The Great National Life Insurance Company was not a party to this financing plan. It had sold the shares and received full payment therefor in money, and, when such shares were resold by the trustees, in 'furtherance of the financing plan, the only duty of the Great National Life Insurance Company was to show by its record that the new purchaser was the owner of the shares; this was done, as above stated, by the trustees surrendering the resold shares issued to them as trustees and the reissuing of such shares to the new purchaser and in his name. There was no other obligation resting on the Great National Life Insurance Company in respect to the shares of stock issued to appellants as trustees for the subscribers. So far as the insurance company is concerned, the original sale of the shares was a cash transaction.

■ It was evidently believed by the parties that the shares would be resold for the purchase price paid by the subscribers, within a reasonable time, and hence the underwriting agreement is to end within one year, unless it should be renewed. As we have seen, it was renewed twice, and, owing to the financial depression, only a relatively small amount of shares of stock was resold, and there is nothing in the underwriting agreement from which it could be concluded that, if the shares were not resold, the obligation of the subscribers to pay the note executed by the trustees would cease to exist. Any such agreement would be prohibited under the constitution and law of this state; but, aside from this, no such conclusion can be reasonably drawn from the phraseology of the underwriting agreement. Indeed, the contention of appellee is in direct conflict with the underwriting agreement.

■ There is nothing unlawful in this state in the purchase of stock in a corporation with money borrowed from a third party, secured by a pledge of the stock to the lender. In its last analysis, such is the transaction of the subscribers under the terms of the underwriting agreement in the instant case. The following authorities are authority for the conclusion here reached: Lone Star Life Ins. Co. v. Shield (Tex.Com.App.) 228 S.W. 196; Mitchell v. Porter (Tex.Com.App.) 223 S.W. 197; Willis v. First Nat'l Bank of Littlefield (Tex.Civ.App.) 22 S.W.(2d) 471; Upton v. Tribilcock, 91 U.S. 45, 23 L.Ed. 203.

■ The contention of appellee that his subscription to stock is without consideration is untenable, as is clearly shown on the face of the underwriting agreement. It there appears that the consideration was the mutual promises of the parties to the instrument.

■ Appellee's contention that, because Bert J. Jones, a vice president and director of the Great National Life Insurance Company, who presented to appellee the underwriting agreement, represented to appellee that he would not be called upon to pay the amount of his stock subscription to the insurance company, as the insurance company, by the agreement he was called upon to sign, promised to resell the stock, and he was only lending the use of his name to such company, is untenable. The underwriting agreement contains no promise of the insurance company to resell the stock, to be purchased by the subscribers to such instrument. The pledge of the insurance company to sell the stock referred to is the initial sale of the stock to the sixteen subscribers, and clearly has no reference to the resale of the stock after it was purchased by the subscribers. The instrument does show that the subscribers did expect the stock to be resold, but clearly places this duty of reselling on appellants as trustees of the subscribers, and nowhere intimates that such duty rests on the insurance company.

■ Appellee was an experienced businessman and must have known that he would have to look to the conditions set out in the instrument he signed for its. contents, and not listen to representations of the man who presented such instrument. If he had read the instrument, he would have known that the representations made

by Bert J. Jones were in direct contradiction of the instrument he signed, hence could not have been authorized by appellants, who were acting as his trustees. This contention is overruled. The duty of securing signatures of the subscribers to the underwriting agreement rested on the trustees and not on the insurance company. The fact that Bert J. Jones was a vice president and director of the insurance company in no way tended to prove that he was the agent of appellants and authorized by them to make such representations. 17 Tex.Jur. 791, § 352, and cases cited in footnote.

■ The defensive issues found in favor of appellee were not raised, either by pleading or evidence, in that there is not, even by implication, any evidence that appellants as trustees ever authorized any such representations; as found by the jury, to be made to appellee. We are of opinion, therefore, that appellee presented no valid defense to the cause of action alleged and proved by the appellants, and that the court erred in refusing the requested peremptory instruction.

■ As the case seems to have been fully developed, there exists no reason for remanding this cause, and hence we reverse the judgment of the lower court in favor of appellee, and here render judgment in favor of appellants for the balance due on appellee's obligation as co-maker of the underwriting agreement, which balance we find to be the sum of $5,256.16, with interest at the rate of 10 per cent. per annum from March 7, 1935.

Reversed and rendered.

On Motion for Rehearing.

YOUNG, Justice.

Complaint is made by appellee in motion for rehearing that this court failed to consider or discuss the cross-assignments of error in his brief, Nos. 1 to 18. These cross-assignments were, in effect, considered and overruled in our original opinion, by reason of our conclusion therein reached as to the law of this case. However, we have again reviewed said cross-assignments severally and they are now overruled.

■ We conclude that there is merit in appellees' assignments of errors Nos. 5 and 6, in his motion for rehearing. In rendering the case we found appellants, Weichsel and Hay, to be due $5,256.16, with interest at the rate of 10 per cent. from March 7, 1935. Of this amount, $950.56 was included as attorney's fee. Under the record, appellants paid no attorney's fee to the bank when the note in suit was taken up. Appellants' right of action being upon an implied contract, and not upon the note, their recovery is for the amount they paid, with legal interest thereon from the date the note was paid. Acers v. Curtis, 68 Tex. 423, 4 S.W. 551, Hays v. Housewright (Tex.Civ.App.) 133 S.W. 922.

Accordingly, our original opinion should be corrected and judgment rendered in favor of appellants and against appellees in the sum of $4,305.60, with interest at 6 per cent. per annum from March 7, 1935.

With this modification, appellee's motion for rehearing is in all things overruled.

Overruled.